# EXHIBIT A

Law Division Motion Section Initial Case Management Dates for CALENDARS (A,B,C,D,E,F,H,R,X,Z) will be heard In Person.
All other Law Division Initial Case Management Dates will be heard via Zoom
For more information and Zoom Meeting IDs go to https.//www.cookcountycourt,org/HOME?Zoom-Links?Agg4906_SelectTab/12
Court Date: <<CmsHearingStart>>

**12-Person Jury**

FILED
2/26/2025 5:05 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025L002823
Calendar, N
31587699

FILED DATE: 2/26/2025 5:05 PM 2025L002823

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| GTS SECURITIES, LLC<br><br>Plaintiff,<br><br>- against -<br><br>CBOE EXCHANGE, INC.<br>& CBOE EDGX EXCHANGE, INC.,<br><br>Defendants. | Case No.:<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff GTS Securities, LLC ("GTS"), for its Complaint against Defendants Cboe Exchange, Inc. ("Cboe Options") and Cboe EDGX Exchange, Inc. ("EDGX") (collectively, "Cboe" or "Defendants"), states as follows:

## NATURE OF THE ACTION

1. Defendants Cboe Options and EDGX are both self-regulatory organizations ("SROs"), *see* 15 U.S.C. § 78c(a)(26), and as such, they have been delegated certain regulatory duties by the SEC.

2. However, this case does not involve Defendants' exercise of any delegated regulatory duties. Indeed, as explained below, Defendants admitted that the circumstances presented by this case fall outside the scope of Defendants' SEC-approved rules and delegated regulatory purview.

For updated information about your case, including hearings, subsequent filings and other case information, please visit our Online Case Search and search for your case: https://casesearch.cookcountyclerkofcourt.org

FILED DATE: 2/26/2025 5:05 PM 2025L002823

3. Rather, this case involves Defendants' fraud. Specifically, Defendants defrauded GTS out of valuable "Designated Primary Market Maker" ("DPM") appointments on both exchanges—deceiving GTS into believing that it could transfer its DPM appointments to other firms for consideration, via an "endorsement" process suggested by Defendants.

4. Specifically, Defendants intentionally deceived GTS into believing that it could transfer its DPM appointments for consideration by (1) entering into private commercial arrangements with other firms to transfer the DPM appointments for consideration, (2) resigning its DPM appointments with Cboe Options and EDGX, and (3) simultaneously "endorsing" the transferee firms to Cboe Options and EDGX so that the transferee firms could receive the reallocated DPM appointments. Defendants intentionally deceived GTS into believing that if it followed this "endorsement" process, Defendants would in fact reallocate the DPM appointments to the endorsed transferee firms, and GTS would then receive the agreed-upon consideration from those firms.

5. In reliance on Defendants' representations, GTS followed this process, and negotiated and entered into private commercial arrangements with two transferee firms—"Firm A" and "Firm B"—agreeing to transfer the DPM appointments for consideration. Then, consistent with its discussions with Defendants, GTS simultaneously resigned its DPM appointments and endorsed the reallocation of those appointments to Firm A and Firm B. However, despite their prior representations—and knowledge that GTS had acted in reliance on those representations—Defendants then reallocated the DPM appointments to numerous firms other than Firm A and Firm B, thereby negating GTS's commercial arrangements with Firm A and Firm B. As a result, Defendants' fraud caused GTS to both (1) resign its valuable DPM appointments, from which it generated consistent profits, and (2) be deprived of the valuable consideration it had negotiated

FILED DATE: 2/26/2025 5:05 PM 2025L002823

with Firm A and Firm B in exchange for the transfer of the DPM appointments. Having engaged in this course of misconduct, Defendants are now liable for both common law fraud and violations of the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.*

## PARTIES

6. Plaintiff GTS is a limited liability company organized under the laws of the state of Delaware with its principal place of business in New York, New York. GTS is an SEC registered broker-dealer. GTS is a trading and technology firm, trading over 30,000 different financial instruments globally and serving many of the world's leading financial institutions and public companies.

7. Defendant Cboe Options is a corporation organized under the laws of Delaware with its principal place of business in Chicago, Illinois. Cboe Options operates the largest options exchange in the United States. Cboe Options is a subsidiary of Cboe Global Markets, Inc. ("Cboe Global").

8. Defendant EDGX is a corporation organized under the laws of the state of Delaware, with its principal place of business in Chicago, Illinois. EDGX operates an all-electronic options exchange. EDGX is a subsidiary of Cboe Global.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this dispute pursuant to 735 ILCS 5/2-209, because Defendants transact business within the State of Illinois and committed tortious acts within the State of Illinois.

10. Venue in this Court is appropriate pursuant to 735 ILCS 5/2-101, because Defendants reside in Cook County, and the transaction or some part thereof out of which this case arose occurred in Cook County.

FILED DATE: 2/26/2025 5:05 PM 2025L002823

## STATEMENT OF FACTS

11. Cboe Options operates the largest options exchange in the United States, and EDGX operates an all-electronic options exchange from their headquarters in Chicago, Illinois. According to the Cboe Global Form 10-K for the year ended December 31, 2022 (the "Cboe Global 10-K"), Defendants' customers "include trading permit holders and members of Cboe Options [and] EDGX. . . which are SEC-registered broker-dealers." As set forth in the Cboe Global 10-K, Defendants market themselves as providing those customers with "market infrastructure and tradable products," as well as "data and access solutions."

12. In return, those customers provide Defendants with hundreds of millions of dollars in annual revenue. As described in the Cboe Global 10-K:

> For our U.S. derivatives options markets, Cboe Options is a hybrid market combining open outcry floor trading with electronic trading. For multi-listed products, we utilize public customer priority, market turner in certain products, participation rights and pro-rata allocation market models, combined with the "classic" pricing model. Under the classic pricing model, professional participants pay transaction fees, public customers generally do not pay transaction fees and market makers compensate brokers for sending order flow to the exchange (known as payment for order flow). For proprietary products, we use price-time or pro-rata allocation, sometimes with public customer priority, and market turner market models, combined with a pricing model where all market participants generally pay fees. . . . EDGX options utilizes customer priority, participation rights and pro-rata allocation market models, combined with the classic pricing model.

*Id.* at 13.

13. GTS became a member and trading permit holder ("TPH") of Cboe Options and EDGX in November 2019 and February 2020, respectively. GTS is also a customer of both Cboe Options and EDGX. GTS has paid in excess of $30 million in fees to Cboe Options and EDGX in exchange for access to their "market infrastructure and tradable products," as well as their "data and access solutions," among other things.

FILED DATE: 2/26/2025 5:05 PM 2025L002823

14. In addition, from March 2020 to September 2023, GTS was a DPM for both Cboe Options and EDGX. On Cboe Global's website, it describes the DPM program as follows:

> A "Designated Primary Market-Maker" or "DPM" is a [TPH] organization that is approved by the Exchange to function in allocated securities as a Market-Maker on the trading floor. DPMs may apply to be allocated new listings (or classes being reallocated from another DPM organization) through an exchange sponsored solicitation process. Authorized Exchange staff will allocate the products based on performance, capacity, performance commitments, efficiency, competitiveness, and operational factors. Each DPM organization must have the appropriate number of Market Maker Permits to cover the cost of their option class allocations.

15. GTS became a DPM in March 2020, when it acquired Barclays Capital Inc.'s ("Barclays") DPM business. As described by Cboe Global in a public release, following the acquisition, Cboe Options reallocated Barclays' DPM appointments to GTS:

> The Exchange has approved, pursuant to Exchange Rule 3.53, a proposal from Barclays Capital Inc. and GTS Securities, LLC, both TPH organizations approved to operate as DPMs, regarding a transfer of Barclays Capital Inc.'s Off-Floor DPM appointment.
>
> Under the proposal and effective March 25, 2020, all classes currently allocated to Barclays Capital Inc. as a DPM, would be reallocated to GTS Securities, LLC as an Off-Floor DPM, who will be responsible for the management and operation of the DPM. Staffing and personnel of the DPM will remain largely unchanged.

16. Cboe Options Rule 3.53, which Cboe Global referenced in its release announcing GTS's appointment as a DPM, governs the transfer of DPM appointments in certain circumstances. Specifically, Rule 3.53(h) provides a procedure for the transfer of DPM appointments in the event of: "(i) any sale, transfer, or assignment of any significant share of the ownership of a DPM; (ii) any change or transfer of control of a DPM; or (iii) any merger, sale of assets, or other business combination or reorganization of a DPM."

17. Historically, options exchanges (including, on information and belief, Cboe exchanges) have permitted the transfer of DPM appointments between firms in circumstances other than those provided for in Rule 3.53(h). In addition, Cboe has previously issued Exchange

FILED DATE: 2/26/2025 5:05 PM 2025L002823

Bulletins indicating that it permitted the transfer of DPM appointments for consideration, without any suggestion that the transfer involved a change in ownership structure or was a part of any larger business transaction such as those outlined in Rule 3.53(h).

18. In addition, when Barclays was engaged in discussions to acquire the DPM business from another firm, then-Barclays employees Kirill Gelman and Eric Levine—the same employees that later operated the DPM business for GTS—engaged in direct conversations with Ed Tilly, the former CEO of Cboe Global. During those discussions, Gelman and Levine expressed apprehension regarding entering Cboe's DPM business. In response, Tilly assured them that if they ever decided to exit Cboe's DPM business, Cboe would collaborate with them to ensure that their interests were protected.

19. At all times following its appointment as a DPM in March 2020, GTS fulfilled its obligations as a DPM and maintained fair and orderly markets in its allocated options. GTS generated consistent profits from its DPM business during this period, and at the same time, paid Cboe Options and EDGX over $30 million in fees.

20. David Creagan is Cboe Global's Director, Derivatives Account Coverage. At all times relevant to this Complaint, Creagan was acting as an authorized agent of Cboe Global, Cboe Options, and EDGX.

21. On July 18, 2023, Creagan sent an email to Gelman and Levine, stating that Cboe was "working through an assessment of [Cboe Options] and EDGX electronic DPMs and the quote quality that is being provided in the names in which [market maker] firms have a DPM appointment." This review measured DPM quote quality against new criteria that Cboe had not previously articulated to GTS and is not in the Cboe rulebook. Creagan then identified nine symbols, stating, "[n]ote the nine underlying symbols below where [GTS] is the electronic DPM

FILED DATE: 2/26/2025 5:05 PM 2025L002823

and where the quote performance is below the criteria threshold." Creagan closed by stating:

> There are two approaches that [GTS] can take with respect to these three [sic] names: 1. Commit to improving / meeting the minimum quote performance threshold criteria, prior to the third week of August, in order to keep the DPM appointment, or 2. Voluntarily give up the DPM assignment, in which case we'll look to resolicit at the end of August.

22. Levine responded via email that same day, requesting a call "to connect on this," and stating, "I assume in lieu of voluntarily giving up our assignments, we can transfer to another DPM for a consideration (that's how we got most of the book in the first place years ago)?" Creagan replied: "We can go over the details on our call. Right now if you were to either give-up the DPM or did not meet the requirements the name would be up for re-allocation and offered to all to apply for. We would not allow a transfer for a another [sic] consideration."

23. Given Cboe's prior assurances that it would collaborate with the employees to protect their firm's interests should it decide to exit the DPM business—and consistent with past practice at Cboe and current industry practice at other exchanges—GTS expressed surprise at Creagan's reply. Specifically, Levine asked, "When did selling DPM books end?" Creagan responded in a July 18, 2023 email: "Probably before my time here but not for many years. I'll see if I can find out now that you got my curiosity going." Creagan then sent a follow-up email later that day, stating: "I asked one of the guys here who used to be with BOTTA, he said probably when they sold theirs. Not sure if that's accurate though."

24. In light of the conflict between Cboe's historic practice and assurances, and the new position relayed in Creagan's emails, GTS asked for additional time to consider its options with regard to the DPM appointments. In a July 24, 2023 email to Levine, Creagan granted this request, stating: "[W]e are extending the evaluation period by 1 month for the DPM re-assignment. We

FILED DATE: 2/26/2025 5:05 PM 2025L002823

have an internal call tomorrow to discuss your thoughts on possibly giving up the DPM. I'll get back to you asap."

25. On August 7, 2023, Creagan sent an email invitation to Gelman, Levine, and GTS General Counsel Richard Grant for a Microsoft Teams virtual meeting two days later, on August 9, 2023. The subject line of the invitation read, "Cboe/GTSX Call – Discuss DPM appt.," and the invitation was also sent to various Cboe Global employees (Corinne Klott, Laura Dickman, Michael Shea, Anthony Carone, Anthony Montesano, Katie Mikulak, and Patrick Coicou), which included representatives of its legal department. At all times relevant to this Complaint, these employees were acting as authorized agents of Cboe Global, Cboe Options, and EDGX.

26. Gelman, Levine, and Grant participated in the virtual meeting on August 9, 2023, and in doing so, reiterated the conflict between Cboe's historic practice (and that of other exchanges) and the seemingly new position relayed in Creagan's emails—i.e. that Defendants would not permit GTS to transfer its DPM appointments to another firm for consideration.

27. During the August 9 meeting, Defendants' agents did not dispute Cboe's historic practice of permitting firms to transfer DPM appointments for consideration. Nor did Defendants' agents dispute that this is common practice on other exchanges. Instead, Defendants' agents stated to GTS that Cboe's rules—and in particular, Cboe Options Rule 3.53(h)—did not govern the transfer of DPM appointments in the circumstances presented by GTS. Specifically, Rule 3.53(h) only provides a procedure for the transfer of DPM appointments in the event of: "(i) any sale, transfer, or assignment of any significant share of the ownership of a DPM; (ii) any change or transfer of control of a DPM; or (iii) any merger, sale of assets, or other business combination or reorganization of a DPM."

FILED DATE: 2/26/2025 5:05 PM 2025L002823

28. Defendants' agents further stated to GTS that because GTS proposed to transfer its DPM appointments in circumstances not governed by Cboe's Rules, the proposed transfer did not fall under the purview of Cboe's regulatory and legal procedures. However, Defendants' agents represented to GTS that it was free to make a private commercial arrangement with another firm regarding transfer of the DPM appointments, despite the fact that such a transfer would not be conducted under Cboe's Rule 3.53(h) process.

29. GTS responded to these representations by confirming that it would proceed with the transfer and coordinate with Cboe's commercial staff to effectuate the change, given Cboe's representations that its regulatory and legal procedures did not cover the transaction. Cboe staff did not convey any reservations about GTS proceeding in this fashion.

30. In reliance on Cboe's representations during the August 9, 2023 meeting—and consistent with GTS's intentions clearly articulated to Cboe during the meeting—GTS began soliciting bids from other firms to transfer its DPM appointments for consideration. During this process, GTS repeatedly communicated with Defendants' agents about its solicitation of bids and intention to transfer its DPM appointments via a private commercial arrangement with another firm. At no time during this process did Defendants' agents indicate any reservations about GTS proceeding in this manner or being able to effectuate the desired transfer as part of a private commercial arrangement. In fact, Cboe's commercial representatives led GTS to believe that the DPM transfer would be facilitated by Cboe consistent with past practice at both Cboe and other exchanges, and that the transfer would be effected as a commercial arrangement outside of the purview of Cboe's regulatory and legal procedures.

31. For example, Levine communicated with Cboe Global employees on August 30 and 31, 2023 via email, phone, and Microsoft Teams. These CBOE employees included Anthony

FILED DATE: 2/26/2025 5:05 PM 2025L002823

Montesano (VP, Head of Derivatives Market Structure), Katie Mikulak (Senior Director, Senior Regulatory Advisor), and Jennifer Lamie (Chief Regulatory Advisor). At all times relevant to this Complaint, Montesano, Mikulak, and Lamie were acting as authorized agents of Cboe Global, Cboe Options, and EDGX.

32. During these conversations, Levine explained GTS's intention to transfer the DPM appointments for consideration via a private commercial arrangement with another firm. None of Defendants' agents suggested during these conversations that Cboe would prevent GTS from doing so or that there was any risk that the transfer would not proceed as discussed in these conversations.

33. To the contrary, in phone conversations on August 30 and 31, 2023, Montesano provided Levine with an outline of the steps that GTS must take to ensure that the transfers would occur as intended. Specifically, Montesano represented to GTS that in order to effect the transfer of the DPM appointments to another firm, GTS would need to resign its DPM appointments and simultaneously "endorse" the transfer of those appointments to the other firm in a communication to Cboe. In a follow-up email on September 12, 2023, Levine asked Montesano: "How long do you think the reallocation process will take once I notify you formally? Trying to line up timing with others." Montesano responded the same day, "I think we're looking at October."

34. In reliance on these communications with Defendants' agents, GTS continued to solicit bids from other firms to transfer its DPM appointments for consideration through the endorsement process suggested by Cboe. On information and belief, GTS's counterparts at the other DPM firms from which it solicited bids all shared a common understanding that the endorsement process promoted by Cboe's commercial staff would result in the successful transfer of GTS's DPM appointments to another firm, and GTS received multiple bids from other firms.

FILED DATE: 2/26/2025 5:05 PM 2025L002823

35. Ultimately, GTS reached an agreement with Firm A, pursuant to which (1) GTS would "endorse" the reallocation of the Cboe Options DPM assignments to Firm A (as instructed by Montesano), and (2) upon Cboe Options' reallocation of the DPM assignments to Firm A, Firm A would pay GTS cash consideration. Likewise, GTS reached an agreement with Firm B, pursuant to which (1) GTS would "endorse" the reallocation of the EDGX DPM assignments to Firm B (as instructed by Montesano), and (2) upon EDGX's reallocation of the DPM assignments to Firm B, Firm B would pay GTS cash consideration.

36. GTS notified Montesano that it had reached these agreements with Firm A and Firm B. In a phone call with Levine on or about August 31, 2023, Montesano acknowledged that GTS intended to proceed with the planned transfers to Firm A and Firm B and asked Levine to confirm that Firm A and Firm B were willing and able to take on the respective DPM assignments. Levine provided the requested confirmation to Montesano. At no time did Montesano suggest that Cboe would prevent GTS from transferring the DPM names to Firm A and Firm B or that there was any risk that the transfers would not proceed as discussed.

37. As instructed by Montesano, GTS then notified Cboe that it had decided to resign and endorse the transfer of its DPM appointments to Firm A and Firm B. In a September 19, 2023 email to Montesano and Creagan, Levine wrote:

> As discussed, we have decided to exit the DPM/Specialist business across all options exchanges. It has been a pleasure partnering with the Cboe all these years as a DPM. <u>We will work closely with the firms we have endorsed to take over the books</u> and continue to maintain our commitment as DPM until reallocation takes place.
>
> We look forward to remaining a competitive market maker on both Cboe [Options] and Edgx in the future. Please reach out with any questions.

(emphasis added).

38. In response, neither Montesano nor Creagan suggested that GTS would not be able

FILED DATE: 2/26/2025 5:05 PM 2025L002823

to transfer its DPM appointments to Firm A and Firm B via the "endorsement" process. Nor did either of them suggest that Firm A or Firm B would be unfit for the appointments. To the contrary, Montesano responded in an email the same day: "We appreciate all you and your team have done as a valued partner of Cboe in your role as DPM. Thanks for the clear communication you've provided as you exit that role. We'll work on the reallocations and are glad to have you continue as Market-Maker going forward." (emphasis added).

39. Sonia Alvarez is Cboe Global's Representative, Membership Services. At all times relevant to this Complaint, Alvarez was acting as an authorized agent for Cboe Global, Cboe Options, and EDGX. On September 20, 2023, Alvarez wrote to Gelman, Levine, and Grant via email, stating, "I have just been made aware of [GTS's] decision to exit the DPM business on Cboe and EDGX Options," and asking GTS to "please submit GTS' letter of intent on company letterhead to the Membership Department." Accordingly, on September 25, 2023, Grant delivered a letter to Ms. Alvarez via email, stating:

> I am writing as a follow-up to prior communications with Cboe Options ("Cboe") staff concerning the plans of [GTS] to alter its [DPM] status. Please accept this letter as written confirmation that GTS intends to exit the DPM business on Cboe.
>
> In conjunction with this exit we understand that Cboe will undertake a reallocation of GTS's assigned DPM securities. Consistent with past practice and as previously discussed with Cboe staff, GTS has entered into a commercial arrangement with [Firm A] regarding the transfer of GTS's assigned DPM securities to [Firm A] through the Cboe reallocation process. To that end, we fully endorse [Firm A] as the recipient of the GTS DPM securities and believe that [Firm A] will provide excellent DPM services to these symbols. We thus strongly encourage Cboe to reallocate the entire group of single stock and ETF symbols for which GTS is currently DPM to [Firm A].
>
> It has been a pleasure for GTS to partner with Cboe for all these years as a DPM. We commit to working closely with Cboe and [Firm A] to ensure a seamless transition of the GTS DPM securities, and to continue effectively serving as DPM until the reallocation takes place.

(emphasis added).

FILED DATE: 2/26/2025 5:05 PM 2025L002823

40. Similarly, on September 25, 2023, Grant delivered another letter to Ms. Alvarez via email, stating:

> I am writing as a follow-up to prior communications with EDGX Options ("EDGX") staff concerning the plans of [GTS] to alter its [DPM] status. Please accept this letter as written confirmation that GTS intends to exit the DPM business on EDGX.
>
> In conjunction with this exit we understand that EDGX will undertake a reallocation of GTS's assigned DPM securities. Consistent with past practice and as previously discussed with EDGX staff, GTS has entered into a commercial arrangement with [Firm B] regarding the transfer of GTS's assigned DPM securities to [Firm B] through the EDGX reallocation process. To that end, we fully endorse [Firm B] as the recipient of the GTS DPM securities and believe that [Firm B] will provide excellent DPM services to these symbols. We thus strongly encourage EDGX to reallocate the entire group of symbols for which GTS is currently DPM to [Firm B].
>
> It has been a pleasure for GTS to partner with EDGX for all these years as a DPM. We commit to working closely with EDGX and [Firm B] to ensure a seamless transition of the GTS DPM securities, and to continue effectively serving as DPM until the reallocation takes place.

(emphasis added).

41. In response, no one from Cboe suggested that Cboe would not permit GTS to transfer its DPM allocations as indicated or that there was any risk that the transfers would not proceed as discussed. Instead, on September 22, 2023, Creagan emailed Levine and stated that the reallocation process would begin on September 25, 2023.

42. In fact, Defendants commenced the reallocation process on September 26, 2023. That day, Creagan emailed Levine stating: "Solicitation process has started for the first 50 names on [Cboe Options] and all EDGX names. These will be allocated today for trading tomorrow." In response, Levine asked "Why split up?"—questioning why all of the symbols would not be reallocated to Firm A and Firm B at once. Creagan replied by attributing it to a technological issue, stating: "Our allocation tool has a limit on how many names it can handle at 1 time." Creagan

FILED DATE: 2/26/2025 5:05 PM 2025L002823

never suggested that Defendants would not in fact reallocate the symbols to Firm A and Firm B, as Defendants knew GTS believed they would.

43. In truth, however, Defendants began reallocating the symbols—50 at a time—to numerous different firms. As a result, Firm A had no obligation to pay GTS the agreed-upon cash consideration, which was only due upon Cboe Options' reallocation of the DPM appointments to Firm A. Likewise, Firm B had no obligation to pay GTS the agreed-upon cash consideration, which was only due upon EDGX's reallocation of the DPM appointments to Firm B.

44. Levine reached out to Montesano in a phone call on or about September 26, 2023 to express GTS's concerns regarding Cboe's misrepresentations and the re-allocation process. In that call, Montesano stated that he was "surprised" that the DPM appointments had not been reallocated to Firm A and Firm B and stated that he would investigate internally at Cboe to determine what had happened. Similarly, representatives of Firm A and Firm B expressed that they were shocked and let down by Cboe's conduct.

45. On September 27, 2023, Grant wrote to Alvarez, explaining Cboe's misrepresentations and the resulting harm to GTS:

> [GTS] was disappointed to learn of recent actions by Cboe Options and EDGX Options to reallocate GTS's [DPM] securities in a manner that was contrary to discussions between GTS and Cboe staff, inconsistent with settled practice, and knowingly caused severe financial harm to GTS.
>
> The letters GTS sent to Cboe Options and EDGX Options dated September 25, 2023 regarding an exit of the DPM business and reallocation of GTS's DPM securities to [Firm A] and [Firm B], respectively, were sent in reliance on discussions with Cboe staff and past practice of the exchange. GTS would not have sent the letters, or conveyed any intention to give up its DPM names, had the company been aware that Cboe intended to act in a manner inconsistent with direct conversations with GTS as well as past practice.

46. Indeed, if Defendants had not misled GTS into proceeding via Cboe's suggested "endorsement" process, GTS would have either (1) continued acting as a DPM (and continued to

FILED DATE: 2/26/2025 5:05 PM 2025L002823

earn the resulting profits), or (2) structured a broader transfer of its DPM business in a manner governed by Cboe Options Rule 3.53(h) (and reaped the resulting profits of such a transaction). But, because Defendants represented to GTS that their transfer rules did not apply in the present circumstances, that GTS could instead proceed with a private commercial arrangement, and that the desired transfer would be accomplished through the "endorsement" process outlined to GTS, GTS proceeded with Cboe's suggested "endorsement" process.

47. Defendants knew that GTS reasonably believed Defendants would reallocate the DPM symbols to Firm A and Firm B, and Defendants knew that GTS would be financially harmed if they did not do so. Indeed, as a result of Defendants' fraud and deception, GTS has been deprived of the financial benefits of its DPM appointments, as well as the financial benefits that it reasonably expected via the transfer of its DPM appointments to Firm A and Firm B.

**COUNT I - FRAUD**

48. GTS incorporates Paragraphs 1-47 as if fully restated herein.

49. As set forth in Paragraph 21-47 above, Cboe Options and EDGX fraudulently misrepresented to GTS that it could successfully effect the transfer of its DPM appointments to Firm A and Firm B via the "endorsement" process suggested by Cboe. These misrepresentations were the scheme employed by Cboe Options and EDGX to accomplish their fraud.

50. Defendants intended that GTS would rely on their misrepresentations and GTS did in fact do so. GTS's reliance was reasonable, in part because Defendants' misrepresentations concerned facts actually or presumptively within their knowledge and contained nothing so improbable as to cause doubt of their truth.

51. Defendants also knew that GTS was acting in reliance on and did, in fact, rely on their representations that it could successfully transfer its DPM appointments to Firm A and Firm

FILED DATE: 2/26/2025 5:05 PM 2025L002823

B via the "endorsement" process suggested by Cboe. Accordingly, Defendants had a duty to disclose to GTS that they would not in fact reallocate the DPM appointments to Firm A and Firm B.

52. GTS has suffered damages as a direct and proximate result of Defendants' fraud. But for Defendants' fraud, GTS would either have (1) retained its DPM appointments, or (2) structured a transfer of its DPM business pursuant to Cboe Options Rule 3.53(h) (or applicable EDGX rules). In either case, GTS would have generated profits that it has now been deprived of due to Defendants' fraud.

53. Defendants' fraud was committed willfully, maliciously, and with wanton disregard for GTS's rights.

WHEREFORE, GTS respectfully requests that this Court grant GTS the following relief:

a) Compensatory damages from both Defendants, each exceeding $50,000 individually, and totaling over $2 million in aggregate;

b) Prejudgment interest from both Defendants;

c) Punitive damages from both Defendants; and

d) Any further relief that the Court deems just and proper.

**COUNT II – VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT**

**(815 ILCS 505/1 *et seq.*)**

54. GTS incorporates Paragraphs 1-47 above as if fully restated herein.

55. As set forth in Paragraphs 11-13 & 19 above, GTS is a "consumer" of Cboe Options' and EDGX's goods and services, as that term is defined in the Illinois Consumer Fraud Act. *See* 815 ILCS 505/1(e).

56. In addition, Defendants' fraud involves conduct directed toward the market

FILED DATE: 2/26/2025 5:05 PM 2025L002823

generally and otherwise implicates consumer protection concerns. Ultimately, Defendants' misconduct was not just directed toward GTS, but also toward Firm A and Firm B, as well as all other firms to which the DPM appointments were re-allocated. In addition, Defendants' misconduct implicates broader consumer protection concerns because there is a strong public interest in maintaining the integrity of securities markets, such as Cboe Options and EDGX, and in truthful statements by marketplace participants.

57. As set forth in Paragraphs 21-47 above, Defendants deceived GTS into believing that it could successfully transfer its DPM appointments to Firm A and Firm B via the "endorsement" process suggested by Cboe. In doing so, Defendants engaged in deceptive acts or practices.

58. Defendants intended that GTS would rely on their deception, and GTS did in fact do so. GTS's reliance was reasonable, in part because Defendants' misrepresentations concerned facts actually or presumptively within their knowledge and contained nothing so improbable as to cause doubt of their truth.

59. Defendants also knew that GTS was acting in reliance on their representations that it could successfully effect the transfer of its DPM appointments to Firm A and Firm B via the "endorsement" process suggested by Cboe. Accordingly, Defendants had a duty to disclose to GTS that they would not in fact reallocate the DPM appointments to Firm A and Firm B.

60. Defendants' deception occurred in the course of conduct involving trade or commerce.

61. GTS has suffered damages as a direct and proximate result of Defendants' deception. But for Defendants' deception, GTS would either have (1) retained its DPM appointments, or (2) structured a transfer of its DPM business pursuant to Cboe Options Rule

FILED DATE: 2/26/2025 5:05 PM 2025L002823

3.53(h) (or applicable EDGX rules). In either case, GTS would have generated profits that it has now been deprived of due to Defendants' fraud.

62. Defendants' violation of the Illinois Consumer Fraud Act was willful, malicious, and with wanton disregard for GTS's rights.

WHEREFORE, GTS respectfully requests that this Court grant GTS the following relief:

a) Compensatory damages from both Defendants, each exceeding $50,000 individually, and totaling over $2 million in aggregate;

b) Prejudgment interest from both Defendants;

c) Punitive damages from both Defendants;

d) Reasonable attorneys' fees and costs from both Defendants; and

e) Any further relief that the Court deems just and proper.

Dated: February 26, 2025

Respectfully submitted,

*<u>/s/ Christopher J. Barber</u>*
Christopher J. Barber
Stephen A. Fraser
WILLIAMS BARBER & MOREL LTD.
233 S. Wacker Dr., Ste. 6800
Chicago, IL 60606
Phone: 312.443.3200
Fax: 312.630.8500